IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN REGION OF TEXAS
Houston Division

CPT Cheyne Parham, individually and as
     next friend of M. E. Parham
     and E. J. Parham, and
     Mary Joy Pingca Parham         §
        Plaintiffs
v.                       §      Civil Action No.

Hillary Clinton, Secretary of State
     of the United States, in her official
     capacity, Edward Betancourt, in his
     official capacity and Lisa Mooty,
     in her official capacity and
     individual capacity              §
        Defendants

Petition for Declaratory Relief and Original Complaint

COMES NOW, Plaintiffs, in the above styled cause of action and will show this court that Plaintiffs are entitled to declaratory relief, and Plaintiffs are entitled to damages and relief resulting from violations of the civil rights of CPT Cheyne Parham, M. E. Parham and E. J. Parham and the defamation of CPT Cheyne Parham and Mary Joy Parham.

## PARTIES

1.    Plaintiff, CPT Cheyne Parham is an individual citizen of the State of Texas. Mary Joy Parham, is an individual and the wife of CPT Cheyne Parham. M. E. Parham and E. J. Parham are the infant daughters of CPT Cheyne Parham and Mary Joy Parham.

2.    Defendant, Hillary Clinton is the United States Secretary of State. Defendant, Edward Betancourt, is an employee under the control of Sec. Hillary Clinton, in the Office of Policy Review and Interagency Liaison, Overseas Citizens Services, Bureau of Consular Affairs. Defendant Lisa Mooty, is a consular in the Philippine Embassy, under the control of Sec. Hillary Clinton. Defendants may be served by delivering a copy of the summons and of the complaint to the Tim Johnson, Acting United States Attorney for the Southern District at P O Box 61129, Houston, Texas

77208; and by sending a copy of the summonos and complaint by registered or certified mail to the Eric Holder the Attorney General of the United States at 950 Pennsylvania Ave, NW, Washington, DC 20530-0001. Additionally, the Defendants should be served individually as follows: Sec. Clinton may be served by serving a copy of the summons and complaint by registered or certified mail to Alicia Frechette, Executive Director, Office of Legal Advisor, 2201 C Street NW Room 5519, United States Department of State, Washington DC 20520.  Defendant Edward Betancourt may be served by serving a copy of the summons and complaint by registered or certified mail to U. S. Department of State CA/OCS/PRI,  SA 4th Floor, 2201 C Street NW, Washington DC 20520.  Lisa Mooty may be served by serving a copy of the summons and complaint by registered or certified mail to United States Embassy - Manila Philippines, Consular Section, U. S. Embassy, Attn: Lisa Mooty, American Citizen Services, PSC 500 Box 26; FPO AP 96515.

## JURISDICTION

3.     The court has jurisdiction over the suit for declaratory relief because the actions arise under Article IV of the United States Constitution, Title 8 Sec. 1401 of the United States Code and Title 42 U.S.C. §666 et seq, where M. E. Parham and E. J. Parham were born in wedlock and CPT Parham has established his parentage of M. E. Parham and E. J. Parham by identification on the birth certificates, testimony, christening records and a state court adjudication of parentage under the laws promulgated by 42 U.S.C. §666 et seq, as mandated on the states, all of which the State Department is ignoring, and withholding citizenship documents from M. E. Parham and E. J. Parham. An action for declaratory judgment is authorized under 28 U.S.C. §2201, 2202, and F. R. C. P. 57. For the reasons set out above, federal question jurisdiction is proper under 28 U.S.C. §1331 and §1361.

4.     The Court has jurisdiction over suit for civil rights violation because the cause of action arises under the First, Fourth and Fifth amendments to the United States Constitution, and arises under Title 8 Sec. 1401 of the United States Code, where the State Department and its employees have repeatedly attempted to coerce CPT Parham into an unwarranted and unlawful search of his and his daughters' body by applying the incorrect standards of review to an application for Consular's Report of Birth Abroad for a child born in wedlock, and thereby denying his children entry into the country and thus denying them the First Amendment right of association and assembly of CPT Parham and his children, a liberty interest, and

denying M. E. Parham and E. J. Parham the liberty to enter a country of which they are citizens.  For the reasons set out above, federal question jurisdiction is proper under 28 U.S.C. §1331, and §1343.

5.      The court has jurisdiction over the suit for defamation where the State Department, by and through its employees, and Ms. Mooty personally, during the process of reviewing the application for Consular's Report of Birth Abroad has published statements which falsely accuse CPT Parham of acts which, if true, would be criminal in nature, without any knowledge of any evidence or any rational basis for the false allegation. Likewise, the State Department, by and through its employees, and Ms. Mooty personally, during the process of reviewing the application for Consular's Report of Birth Abroad has published false statements which accuse Mary Joy Parham of acts which, if true, would be criminal in nature, without any knowledge of any evidence or any rational basis for the false allegation. All allegations of defamation are ancillary to the federal questions raised above, and enjoys supplemental jurisdiction under 28 U.S.C. §1367, because the claims are so related to the claims within the court's original jurisdiction that they form part of the same case or controversy under Art. 3 of the United States Constitution.

## VENUE

6.      Venue is appropriate where the permanent residence and home of record for CPT Parham is in the Southern District of Texas.  CPT Parham is currently serving in the military and his home of record is in Texas.  Mary Joy Parham is a foreign national currently in the Philippines, M. E. Parham is an American Citizen temporarily in the Philippines as a result of the actions of the State Department and E. J. Parham is an American Citizen temporarily in the Philippines as a result of the actions of the State Department.

## CONDITIONS PRECEDENT

7.      All conditions precedent have been performed or have occurred.

## FACTS

8.      CPT Cheyne Parham is a Captain in the United States Army.

9.      CPT Cheyne Parham enlisted in military service in December, 1998, and was commissioned as an officer in August, 2005.

10. CPT Cheyne Parham's permanent residence and home of record is Hempstead, Texas 77445.

11. CPT Cheyne Parham is currently stationed in FT Knox, Ky until CPT Cheyne Parham completes the Manuever Captain's Career Course.

12. From April, 2006 until June, 2008, CPT Cheyne Parham was stationed in S. Korea, in Camp Casey/Hovey with the 4th Squadron, 7th Cavalry Regiment, a United States Army Unit.

13. In September, 2007, CPT Cheyne Parham met Mary Joy Pingca.

14. In November, 2007, CPT Cheyne Parham asked Mary Joy Pingca to marry him, just before taking leave to visit his parents in the United States over the Thanksgiving holidays.  He, in fact, asked the parents of Mary Joy Pingca for their permission to marry.

15. The first part of December, 2007, when CPT Cheyne Parham returned from leave to Korea, Mary Joy Pingca and CPT Cheyne Parham picked out and purchased her engagement ring, but soon realized that the USFK policy prevented immediate marriage.

16. After the first of the year, in January, 2008, CPT Cheyne Parham began researching the requirements that CPT Cheyne Parham had to fulfill to marry a foreign national while on duty in Korea, under USFK.

17. CPT Cheyne Parham learned that the time required to fulfill the requirements of marriage in Korea under USFK would exceed the time CPT Cheyne Parham had remaining on his tour in Korea.

18. In February, 2008, CPT Cheyne Parham and fiancee Mary Joy Pingca learned that they were expecting a child.

19. In March, 2008, CPT Cheyne Parham provided transportation fees including air fare for Mary Joy Pingca to return to the Philippines, her native country, to prepare for their marriage as soon as CPT Cheyne Parham could take leave.

20. In April, 2008, after the April Squadron EXEVAL, while on approved military leave, CPT Cheyne Parham traveled to Davao City, Davao, Philippines, where a marriage ceremony was performed on April 12, 2008, which united

CPT Cheyne Parham and Mary Joy Pingca in wholly matrimony, after having a marriage license issued for the ceremony.

21. The Marriage License was recorded on April 18, 2008, and under the laws of the Philippines, CPT Cheyne Parham understands his anniversary is the date of recordation.

22. A certified copy of the Marriage License was provided to the U. S. Embassy in the Philippines in support of the request for Consular's Report of Birth Abroad.

23. CPT Cheyne Parham returned to Korea, and visited with his wife via webcam, telephone, email and text messages.

24. On June 3, 2008, CPT Parham's tour in Korea was completed, and CPT Cheyne Parham returned to the United States.

25. CPT Cheyne Parham was under the impression that a relative of Mary Joy Pingca Parham had been working on the immigration papers that would allow Mary Joy Pingca Parham to join him in the United States within days of his arrival.

26. CPT Cheyne Parham learned, once in the United States that the relative was actually overwhelmed, and too embarrassed to tell Mary Joy Pingca Parham that nothing had been done.

27. Mary Joy Pingca Parham, and CPT Cheyne Parham then engaged the services of another person to prepare the items needed for his wife to travel to the United States.

28. The immigration papers were about ready to be filed when the doctor taking care of the pregnancy told Mary Joy Pingca Parham that she would not be given medical permission to travel (fly), which is a requirement in the Philippines for any air travel while pregnant.

29. The medical denial of air travel permit denied Mary Joy Pingca Parham the ability to interview at the Embassy in Manila, as well as, travel to the U. S. if a visa were somehow granted.

30. At the end of August, 2008, M. E. Parham and E. J. Parham were born, prematurely by C-section due to complications.  Their original due dates had been October 18, 2009.  The children were a little over 4 pounda each,

and resided approximately 10 days in neo-natal intensive care for premature births at the Davao Doctors Hospital.

31. Certified  copies of the birth certificate for E. J. Parham and M. E. Parham was provided to the U. S. Embassy in the Philippines in support for the application for Consular's Report of Birth Abroad.  Each birth certificate named CPT Cheyne Parham as the father of the child.

32. CPT Cheyne Parham was able to see his daughters via webcam within the first few hours of life and have lived with them through webcam all of their lifes.

33. CPT Cheyne Parham took leave in October, 2008, traveled to Davao City, Davao, Philippines, and was able to hold his daughters, step son, and wife for about 12 days before CPT Cheyne Parham had to return to Ft. Knox, Ky.  During his visit in the Philippines, CPT Cheyne Parham participated in the christening ceremonies of his twin daughters.  A photograph taken during this time when the family was together in the Philippines was presented to the Consular at the time of the interview in support of the Application for Consular's Report of Birth Abroad.

34. On or about the middle of January, 2009, an application for visitor's visa for Mary Joy Pingca Parham and her 4 year old son, CPT Parham's stepson, along with the Petition for a Consular's Report of Birth Abroad and Application for Passport for E. J. Parham and M. E. Parham was presented to the American Embassy in Manila, Philippines.  In each document CPT Cheyne Parham has acknowledged M. E. Parham and E. J. Parham to be his natural children.

35. CPT Cheyne Parham has continued to engage in the rearing of his children with his wife, including while E. J. was in the hospital with dehydration in December, 2008, through webcam, telephone, text messages, and email.

36. CPT Cheyne Parham has had a high speed DSL line installed, and an internet telephone line (magic jack) in the home owned by Mary Joy Pingca Parham, to facilitate communications between his wife and CPT Cheyne Parham without regard to where CPT Cheyne Parham is stationed around the world.

37. CPT Cheyne Parham has provided financial support for Mary Joy Pingca Parham since before she left the Philippines.

38.   CPT Cheyne Parham has provided financial support and medical support for Mary Joy Pingca Parham and his step son, initially out of pocket then through the Defense Enrollment Eligibility Reporting System and Tricare, the military medical coverage program.

39.   CPT Cheyne Parham has provided financial support and medical support for  E. J. Parham, and M. E. Parham since conception, initially out of pocket, then through the Defense Enrollment Eligibility Reporting System (DEERS) and Tricare, the military medical coverage program.

40.   CPT Parham testified, during the interview with Ms. Mooty, that he had maintained financial responsibility for the family and his natural children since he and Mary Joy had planned to marry and since the babies were born, respectively.

41.   On March 5, 2009, Ms. Mooty refused to issue the Consular Report of Birth Abroad, but issued no letter to that effect.  To date no written notice of deficiency has been provided.

42.   Ms. Mooty stated that Mrs. Parham had stated that while in Korea she worked in a bar.  Mooty further stated that she was not aware of the bars in Korea, but she was aware of the bars in the Philippines, and because of that Mooty was not 100% convinced that Mrs. Parham was exclusive to CPT Parham at the time of conception.

43.   Mooty further asserted to CPT Parham that had the he and Mrs. Parhams been married before conception she would apply the prepondence standard and would not require a DNA test, but because the CPT and Mrs. Parhams were not married at conception the only thing that would satisfy her was a DNA test.

44.   CPT Parham explained that the Department of Defense USFK Policy in Korea had prevented he and Mary Joy from marrying earlier than they had.

45.   CPT Parham further attempted to explain that the USFK would have required that any sexually oriented businesses be off limits to the soldiers, and the establishment where Mrs. Parham worked as a waitress was not a sexually oriented business, and was frequented by military personnel in Korea.

46.   CPT Parham further testified in the interview that he had no doubt that the children were his, and had unquestioningly taken responsibility .  He further

pointed out that Mrs. Parham was not pregnant at the time they were first engaged, and Mrs. Parham had presented a Christmas picture in which she was wearing an engagement ring.

47.     On March 5, 2009, Ms. Mooty informed CPT Parham that although a preponderance applied to children born in wedlock, since these children were conceived out of wedlock, she would apply a "clear and convincing standard" to determine his parentage, and for that she would require a DNA test.

48.     CPT Parham requested a LTC. Riker, an officer stationed at the U. S. Embassy in Manila, Philippines to deliver to Consular Mooty, a copy of the DEERS statement demonstrating financial responsibility for E. J. Parham and M. E. Parham as the natural children of CPT Parham.  Consular Mooty refused to accept the document.  LTC Riker was familiar with USFK and agreed to attempt to explain to Ms. Mooty the nature of the establishments in Korea that complied with the USFK and how the policy precluded immediate marriage.  Ms. Mooty was unwilling to discuss the matter with LTC. Riker.

49.     CPT Parham contacted the State Department in Washington DC for assistance.

50.     During the initial contacts, beginning March 5, 2009, with the Bureau of Consular Affairs, Citizens Services, prior to reaching the Office of Policy Review and Interagency Liaison, Overseas Citizens Services, Bureau of Consular Affairs, CPT Parham and his family were assured by the Bureau of Consular Affairs, Citizens Services that Philippine women were frauds and would do anything to get to the United States, and did not feel as though Mrs. Parham had been slandered by the assertion that she was less than faithful to CPT Parham.  Moreover, information was sent by Ms. Amanda Hicks that related to children born out of wedlock.  CPT Parham made several attempts to explain that the children were not born out of wedlock, at which time Mr. Schwartz, of the Bureau of Consular Affairs, informed CPT Parham that to be born in wedlock, a child must first and foremost be from the bloodline of the parents.  It was at this point that CPT Parham requested Mr. Schwartz speak with his attorney to clarify the definition of born in wedlock.

51.     At the request of Mr. Schwartz, CPT Parham, by and through a representative checked with a State Department approved lab regarding the timeline for a DNA test, and found that from request to passports, the

time frame was more than four months with the assumption that mail from and to the Philippines would take no more than one week, each person involved would act immediately upon receipt of the information from the prior step, and no delay would be incurred through customs.  This information was relayed to Mr. Schwartz, as well as the fact that CPT Parham's school was only about five months long.  The one week mail time was based on the representation of Mr. Schwartz that the State Department's mail to the Philippines took no longer than that.

52.     On March 10, 2009, after several days discussion with Ms. Hicks and Mr. Swartz, R. J. Parham (RJ), CPT Parham's attorney requested to speak with the lawyers that would handle a federal suit, to review the burden of proof being applied by Consular Mooty, in an effort to avoid Federal Court intervention.

53.     On March 11, 2009, RJ was provided the name of the reviewing attorney and informed that the reviewing attorney would probably contact RJ on the following Monday.

54.     On March 13, 2009 an order adjudicating parentage based on  a Joint Pro Se Petition to Determine Parentage was filed in Waller County, Texas, under Tex. Fam. Code §§160.607 & 160.609, was signed by the County Court at Law, pursuant to the Texas statutes mandated by 42 U.S.C. §666 et seq.

55.     On March 14, 2009, CPT Parham, by and through the attorney assisting with the State Department, sent by express mail a copy of the adjudication of parentage to Ms. Mooty in Manila Philippines, and to the attorney identified by the Washington D C State Department.  Additionally, a copy was delivered to Ms. Mooty in Manila Philippines, by Federal Express.

56.     Records of the United States Postal Service indicates that the adjudication of parentage addressed to Ms. Mooty was delivered to the U. S. Embassy in Manila Philippines on or about March 18, 2009.  Records of the United States Postal Service indicates that the adjudication of parentage addressed to the Bureau of Consular Affairs in Washington D C was delivered on or about March 16, 2009, to the address given by the receptionist at the department, and later confirmed as correct by Director Edward Betancourt.

57.     On or about Monday, March 16, 2009, CPT Parham, by and through RJ, attempted to contact the attorney assigned to his review.  After several

attempts, contact was made, at which time RJ was informed that she had been given incorrect information and that another attorney was assigned. A request to speak with that attorney was refused, and there was no confirmation if the express mail delivery had been provided to the new attorney.  RJ was informed that the new attorney had left a voice mail at the office of RJ with further information.

58.     On or about Monday, March 16, 2009, upon arriving at the office RJ noted that the voice mail identified the attorney, and nothing more.  RJ sent a fax advising that the voice mail provided no information.  On Tuesday, March 17, 2009, Edward Betancourt, Director of the Office of Policy Review and Interagency Liason, Overseas Citizens Services, Bureau of Consular Affairs, after the State Department had not returned the calls and RJ had made calls attempting to locate the supervisor of the Department, called, and sent a fax acknowledging the receipt of RJ's letter of representation on March 11, 2009.  The fax stated that no discussion would be had until the records had been obtained and a review had been made.  Normal review could take up to three weeks, and advising that the reviewing individual was Carol Farrand

59.     On or about March 18, 2009, RJ received from Betancourt suggesting, as had been done before, that CPT Parham voluntarily submit to a DNA test for a expeditious resolution to the request for Consular Report of Birth Abroad.  The memo additionally confirmed that the issue in this case is proof of a relationship between the U.S. Citizen parent and the children by a preponderance of the evidence under INA §301(g) [8 USC 1401 (g)]. The letter misstates that the law requires a "biological relationship".  The letter further states that 22 CFR §51.45, allows the State Department may require the applicant (children) to provide any evidence the Department deems necessary to establish U. S. Citizenship which is also a misstatement of the regulations.

60.     INA §301(g) [8 USC §1401(g)] provides as follows:

        The following shall be nationals and citizens of the United States at birth:
        (g) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such peraon, was physically present in the United States or its outlying possessions for a period or periods totaling not less than five years at least two of which were

after attaining the age of fourteen years:  Provided, That any periods of honorable service in the Armed Forces of the United States, or periods of employment with the United States Government or with an international organization as that term is defined in section 288 of title 22 by such citizen parent, or any periods during which such citizen parent is physically present abroad as the dependent unmarried son or daughter and a member of the household of a person (A) honorably serving with the Armed Forces of the United States, or (B) employed by the United States Government or an international organization as defined in section 268 of title 22, may be included in order to ratify the physical-presence requirement of this paragraph. This proviso shall be applicable to persons born on or after December 24, 1952, to the same extent as if it had become effective in its present form on that date

61.   On or abour March 18, 2009, RJ confirmed that review was the intended result.  CPT Parham had advised Mooty that the time required for a transatlantic DNA test would take longer than he had in class, and he wanted to see his children before he was reassigned.  RJ repeated the concern to Betancourt and advised that the request for DNA was premature, and expensive, a fact that was recognized by the State Department's own foreign affairs manual.  Betancourt was advised that NO EVIDENCE contradicted the presumption that CPT Parham was the father of the children, and that evidence that had been provided supported that presumption and was more than sufficient to establish his parentage by a preponderance. Betancourt was also advised that prior assessments had applied a "clear and convincing" standard, rather then the appropriate preponderance.  Additionally, RJ questioned the application of 22 CFR §51.45 to a request for Consular Report of Birth Abroad, when it applies to applications for passports.  RJ additionally confirmed that the lab confirmed that the chain of custody, normally was through the very embassy that seemed determine to deny citizenship.

62.   On March 19, 2009, Bettancourt justified his reliance on 22 CFR §51.45 by the reference thereto in 22 CFR §50.5, and again asserted that the DNA test was available for proof in applications for Consular Reports of Birth Abroad, should the department deem it necessary.  Bettancourt then quoted the last sentence of 22 CFR §50.5, as follows:

The Applicant shall be required to submit proof of:
the child's birth,
identity,

and citizenship meeting the evidence requirements of Subpart C of part 51 of this subchapter

Following quoting this section Betancourt applied the evidence requirements of Subpart C of part 51 of this subchapter to the directly to the child, not to the citizenship of the child through the citizenship of the parent, in conflict with 22 CFR §50.5 (b),  Betancourt further cited 7 FAM 1131.4 a. as authority that a blood relationship is essential.  Betancourt later asserted that FAM is not authoritative, but for guidance in the department.

63.    On or about March 19, 2009, RJ again confirmed to Bettancourt the time frames available to unite this family did not allow for the logistical delays inherent is genetic testing, and pointed out that this, as well as cost, and complexity was listed in his manual at 7 FAM Appendix A-1110 (f) in bright RED LETTERS, which indicated that such testing should only be undertaken when "other credible proof does not establish that the relationship exists."  No additional documentation had been requested.  No explanation had been given as to what documentation had failed.  RJ additionally pointed out that the definition of "filiation" which 7 FAM Appendix A 1110 states as "For the purposes of acquisition of U.S. citizenship, **filiation** is the blood relationship or kinship which exists between a child and the child's biological parents, is in conflict with the definition in *Gaines v. Chew,* 53 U.S. 471 (1851).  The Supreme Court in *Gains* defines "filiation" in terms of nurture not nature, that is the one who directs the morals, disciplines, holds the child, takes responsibility for the child, etc. bloodline is never mentioned.

64.    The FAM admits "The Bureau of Consular Affairs (CA) has interpreted the language in Section 1993 RS, Section 201(g) NA and Section 301(g) INA to mean that a biological and legal relationship exists between the U.S. citizen parent and the child."  7 FAM Appendix A 1110   The Statute and regulation require no biological relationship, but a familial relationship.

65.    On March 19, 2009, in his second letter of that date, Betancourt wrote that the Express Mail had not been received, and extended an offer to accept a fax, but advised that the State Court ruling was not binding on the federal government.  After the department continually quoted the FAM as a basis for the demand of the DNA test, Betancourt admitted that the FAM

"provides guidance only and may not override statutes or regulations", but again asserts that 22 CFR §51.45 allows the request for DNA.  Betancourt additionally requested confirmation that a review was being requested. Betancourt requested CPT Parham state whether DNA testing will be undertaken in this case.

66.    On or about March 19, 2009, RJ wrote Betancourt that a review was and had been requested.  RJ further advised that, in the event that further documentation was deemed necessary, CPT Parham would provide the same. Betancourt was advised by RJ that genetic testing had not been ruled out but should only be requested once documentary evidence had failed under the correct standard of proof.

67.    RJ requested status of files from Philippines on March 25, 2009, and March 26, 2009.  The March 26 inquiry also asked if the certified adjudication of parentage had been located.

68.    On March 27, 2009, Betancourt acknowledged that "some information" had been received from the American Embassy in Manilla.  "We can expect to be in touch with you next week."

69.    On March 27, 2009, RJ responded to Betancourt again inquiring into the adjudication of parentage and transmitting the U.S.Embassy letter in response to a congressional inquiry by Sen John Cornyn dated March 17, 2009, which states in pertinent part "the consular officer handling the case was not convinced that there was 'clear and convincing' evidence that Mr. Parham is the only possible biological father of M. E. and Erica Joy."  The Consul, in the March 17, 2009, letter went on to categorize a picture in front of a christmas tree when Mary Joy Pingca Parham was wearing an engagement ring, and pictures of E. J. and M. E. at two months old with CPT Parham and Mary Joy Pingca Parham as undated pictures.

70.    On April 1, 2009, RJ wrote to Betancourt that the Consul from the American Embassy in Manila, Philippines, had in response to a congressional inquiry by Cong. Michael McCaul had writted a letter identical to the letter sent to Sen. Cornyn on March 25, 2009, with the following exception.  The letter in pertinent part stated, "the consular officer handling the case was not convinced that the preponderance of the evidence supported  Mr. Parham being the only possible biological father of M. E. and Erica Joy."  RJ additionally requested a status of the review since 21 days had passed, which exceeded the "up to three weeks" review before discussion could take place.

71.   Without regard to the version of letter the Court considers from the Manila Consul, the standard being applied to CPT Parham is greater than beyond a reasonable doubt. ["the consular officer handling the case was not convinced [of] . . .  Mr. Parham being the only possible biological father of M. E. and Erica Joy."  When a person is required to eliminate all other posibilities, that exceeds beyond a reasonable doubt.

72.   On or about April 1, 2009, Betancourt responded to the March 25, 2009 letter confirming that they had "received" the mail delivered on March 16, 2009 on March 25, 2009.  The letter further stated information was being reviewed and that Betancourt would "apprise you [RJ] of the outcome of our review as soon as it is complete"

73.   On April 2, 2009, RJ forwarded to Betancourt an affidavit from 1LT Goodney, concerning the employment and fidelity of Mary Joy Pingca Parham during the time of engagement to CPT Parham while in Korea, as well as the character of the working establishment in which Mrs. Parham was employed in Korea.  The letter additionally expressed concerns regarding the "apprise you" line in the prior day's correspondence raised with regard to a discussion of deficiencies or accepting additional documentation, if needed.

74.   On April 2, 2009, RJ, under separate cover, additionally sent an affidavit from Charles Paul Gensterblum concerning the employment and fidelity of Mary Joy Pingca Parham during the time of engagement to CPT Parham while in Korea, as well as the character of the working establishment in which Mrs. Parham was employed in Korea.

75.   On April 6, 2009, RJ transmitted an affidavit from David P Cartwright concerning the employment and fidelity of Mary Joy Pingca Parham during the time of engagement to CPT Parham while in Korea, as well as the character of the working establishment in which Mrs. Parham was employed in Korea, and requested a status report on the review.

76.   On April 7, 2009, RJ transmitted affidavits from Robert J. Walker and Bobby Jones concerning the employment and fidelity of Mary Joy Pingca Parham during the time of engagement to CPT Parham while in Korea, as well as the character of the working establishment in which Mrs. Parham was employed in Korea.  RJ requested Betancourt respond to the inquiry about the discussion and a status report on the review progress.

77.   On April 8, 2008, Betancourt acknowledged the April 2 letter from RJ, and the fax from April 7, 2009, and the affidavits included with those letters. This implies that the April 6, 2009, affidavit was not acknowledged, and possibly only one affidavit on April 2, 2009.  Betancourt states that all files have not been received from Manila YET.  Betancourt agains requests a definitive response from CPT Parham regarding "our request that DNA testing be undertaken in this case."

78.   On April 10, 2009, RJ responded to Betancourt for the FOURTH TIME, regarding DNA testing, that until the documentary evidence, which he has not seen, is determined to be insufficient to meet a preponderance, and it is determined that a preponderance cannot be reached by documentary evidence, a DNA test is inappropriate both fiscally and temporally. Betancourt's attention was further drawn to the fact that the State Department's assertion that mail could be handled in less than a week was not proving true, and the actions of the Embassy definitely ruled out diligence in processing.  For all those reasons, the estimate on time for processing the citizenship including a DNA test had grown to seven months or more.

79.   On April 13, 2009, RJ transmitted to Betancourt an affidavit from Chaplin CPT Tony Hampton, still serving in Korea, concerning the employment and fidelity of Mary Joy Pingca Parham during the time of engagement to CPT Parham while in Korea, as well as the character of the working establishment in which Mrs. Parham was employed in Korea.  The affidavit further confirms the effects the USFK policy had on the marriage of CPT Parham to his wife, and the knowledge of her pregnancy after the engagement, as well as CPT Parham's frustration that they had been unable to marry prior to the pregacy, but CPT Parham's expectations for his new child.

CAUSES OF ACTION BASED ON THE FACTS

DECLARATORY JUDGMENT

80.   Plaintiff's CPT Parham, E. J. Parham and M. E. Parham are seeking declaratory relief by a finding from this Court and an Order, Adjudication and Decree from this Court that parentage has been established by res judicata, or in the alternative, by a preponderance based on the information that has been submitted with the Application for Consular Report of Birth Abroad.

81.  Plaintiff's CPT Parham, E. J. Parham and M. E. Parham are seeking injunctive relief, following the declaratory relief, that the State Department issue a  Report of Birth Abroad recognizing the citizenship of E. J. Parham and M. E. Parham at birth.

82.  Plaintiff's CPT Parham, E. J. Parham, and M. E. Parham are seeing injunctive relief, following the issuance of citizenship documents, that the State Department issue to E. J. Parham and M. E. Parham passports.

CIVIL RIGHTS VIOLATIONS AND DAMAGES UNDER §1983

83.  If the court were to consider the State Department's continual "request that CPT Parham perform the act of a DNA test" as a service, then the State Department's act would fall in the definition of human trafficking where the State Department was withholding citizenship papers under threat or coersion that a person [CPT Parham] perform a service.

84.  Without regard to the potential violation of the human traffiking statutes, the State Department has, under color of law, statute, ordinance, regulation, or custom, willfully subjected CPT Parham, E. J. Parham and M. E. Parham to the deprivation of the right of citizenship, the inability to assemble, and associate guaranteed by the First Amendment of the United States Constitution.  State Department has, under color of law, statute, ordinance, regulation, or custom, willfully subjected E. J. Parham and M. E. Parham to the deprivation of the right of citizenship, and the liberty of entering a country to which they are citizens of at birth guaranteed by the Fifth Amendment of the United States Constitution.   State Department has, under color of law, statute, ordinance, regulation, or custom, willfully subjected CPT Parham, to the deprivation of a liberty interest guaranteed by the Fifth Amendment in his family.  State Department has, under color of law, statute, ordinance, regulation, or custom, willfully subjected CPT Parham, E. J. Parham and M. E. Parham to the deprivation of the right of full faith and credit under Article IV of the United States Constitution.  All such deprivation has been by reason of Mary Joy Parham being a Filipina female, and E. J. and M. E. being Filipina in nationality as well as American in nationality, against the Fifth Amendment of the Constitution and as set out in Title 18 Section 242 and 42 U.S.C. §1983.

85.  Further, the acts alleged in preceding paragraph were originally engaged in by Lisa Mooty, as specifically stated by her in interviews with CPT Parham, the State Department has conspired with Ms. Mooty to further her acts by condoning and defending the acts by Ms. Amanda Hicks and Mr. Schwartz,

and Mr. Betancourt continuing by way of delay and further attempts to coerce a premature response to a request for an unnecessary DNA test when no decision has been rendered by the Department, as required by Department policy, providing a detail of any deficiency in the Application for Consular's Report of Birth Abroad.

## DEFAMATION

86.     It has been published by Lisa Mooty and subsequently by the Consul that Mrs. Parham was an entertainer in a bar in Korea, that was questionably not faithful to CPT Parham during their engagement, leaving no room for the fact that Ms. Mooty was calling Mrs. Parham a prostitute.  Further Ms. Mooty specifically told Mrs. Parham and CPT Parham that Ms. Mooty was unconvinced by Mrs. Parham that she was "exclusive" to CPT Parham and informed CPT Parham that Filipino women would lie to go to the States. Ms. Hicks furthered this comment to a family member of CPT Parham.  Ms. Mooty also told CPT Parham that she did not believe him, and that maybe he was just not aware that the children were not his.  The State Department further sent emails to CPT Parham explaining Fraud in applications for citizenship because of the nature of Filipina women.  In each event, Fraud and Prostitution are crimes, and both CPT and Mrs. Parham have been accused of one or more of these crimes without any evidence that any of it is true.

## DAMAGES

87.     As a direct and  proximate cause of the State Department's actions, CPT Parham has lost valuable time in the development of his twin seven month old girls, time during a development period that cannot be recovered.

88.     As a direct and  proximate cause of the State Department's actions, CPT Parham has lost the cost of housing his family in Manila awaiting the review by Washington DC when no review would have been necessary if the correct standard had been applied by Ms. Mooty.

89.     As a direct and  proximate cause of the State Department's actions, CPT Parham has lost the cost of obtaining a State Court Adjudication of Parentage.

90.     As a direct and  proximate cause of the State Department's actions, CPT Parham has suffered emotional damages, mental anguish, and loss of companionship and consortium.

91.    As a direct and  proximate cause of the State Department's actions, CPT Parham has been delayed in filing for his Spouse and step-son to come to the United States by Visa because the passport status of M. E. and E. J. is necessary for CPT Parham to apply for the balance of his family to come to the United States.  Effectively the State Department is holding CPT Parham's family hostage in the Philippines.

92.    Plaintiff's are entitled to attorney's fees for the willful and wanton disregard of the standard of proof which should have been applied in this case.

<div align="center">PRAYER</div>

Plaintiffs prays this Court, after service of citation, grant the Declaratory Relief and the injunctive relief, sever the actions for finality purposes, and proceed on the civil rights issues, and award Plaintiffs:

Actual Damages
Exemplary Damages
Prejudgment and Post Judgment interest
Costs of suit including attorney's fees
All other relief the court deems appropriate.

Respectfully Submitted,

Law Office of R. J. Parham
916 Wilkins Street
Hempstead, Texas 77445
TEL: 979 826 4838;  FAX: 979 826 4842

R. J. Parham
SBN: 00792737

Exhibit A - 22 CFR 50.5
Exhibit B - Marriage License
Exhibit C - Birth Certificate Erica Joy
Exhibit D - Birth Certificate Mary Elyse
Exhibit E - Order Adjudicating Parentage
Exhibit F - Consul response to Sen Cornyn
Exhibit G - Consul response to Cong. McCaul

Exhibit A

Sec. 50.5  Application for registration of birth abroad.

    Upon application by the parent(s) or the child's legal guardian, a
consular officer or designated nationality examiner may accept and
adjudicate the application for a Consular Report of Birth Abroad of a
Citizen of the United States of America for a child born in their
consular district. In specific instances, the Department may authorize
consular officers and other designated employees to adjudicate the
application for a Consular Report of Birth Abroad of a child born
outside his/her consular district. Under the supervision of a consular
officer, designated nationality examiners shall accept, adjudicate,
disapprove and provisionally approve applications for the Consular
Report of Birth Abroad. The applicant shall be required to submit proof
of the child's birth, identity and citizenship meeting the evidence
requirements of subpart C of part 51 of this subchapter and shall
include:
    (a) Proof of child's birth. Proof of child's birth usually consists
of, but is not limited to, an authentic copy of the record of the birth
filed with local authorities, a baptismal certificate, a military
hospital certificate of birth, or an affidavit of the doctor or the
person attending the birth. If no proof of birth is available, the
person seeking to register the birth shall submit his affidavit
explaining why such proof is not available and setting forth the facts
relating to the birth.
    (b) Proof of child's citizenship. Evidence of parent's citizenship
and, if pertinent, evidence of parent's physical presence in the United
States as required for transmittal of claim of citizenship by the
Immigration and Nationality Act of 1952 shall be submitted.

[31 FR 13537, Oct. 20, 1966, as amended at 61 FR 43312, Aug. 22, 1996]

EXHIBIT A

Municipal Form No. 97 (Form No. 19)
(Revised January 1993)

(To be accomplished in quadruplicate)

**REMARKS/ANNOTATION**

Republic of the Philippines
OFFICE OF THE CIVIL REGISTRAR GENERAL
## CERTIFICATE OF MARRIAGE

Province __Davao del Sur__

City/Municipality __Sta. Cruz__

Registry No.

| | (HUSBAND) | (WIFE) | FOR OCRG USE ONLY: |
|---|---|---|---|
| Name of Contracting Parties | (first) (middle initial) (last) CHEYNE CHRISTOPHER PARHAM | (first) (middle initial) (last) MARY JOY C.PINGCA | Population Reference No. (Husband) |
| Date of Birth/Age | (day) (month) (year) (age) 16 Sept. 1980 26 | (day) (month) (year) (age) 29 July 1983 25 | (Wife) |
| Place of Birth | Houston, Texas | Davao City | TO BE FILLED UP AT THE OFFICE OF THE CIVIL REGISTRAR |
| Sex (Male or Female) | Male | Female | |
| Citizenship | American | Filipino | |
| Residence | Houston, Texas | Poblacion 8,Midsayap Cotabato | |
| Religion | Catholic | Protestant | |
| Civil Status | Single | Single | |
| Name of Father | (first) (middle initial) (last) WILLIAM EUGENE PARHAM | (first) (middle initial) (last) Victor V. Pingca | |
| Citizenship | American | Filipino | |
| Name of Mother | (first) (middle initial) (last) Ruby Jeanette Eddins | (first) (middle initial) (last) Rosalia E. Carael | |
| Citizenship | American | Filipino | |
| Persons who gave consent or advice | (first) (middle initial) (last) Party of Age | (first) (middle initial) (last) Victor V. Pingca | |
| Relationship | | Father | |
| Residence | | Davao City | |

Place of Marriage: Sta. Cruz Church of Christ
(Office of the/House of/Barangay of/Church of/Mosque of)
Sta. Cruz Davao del Sur
Address

Date: __18 April 2008__    Time: __4.00 P.M.__
(day) (month) (year)

THIS IS TO CERTIFY: That I __Cheyne Christopher Parham__
and I, __Mary Joy C. Pingca__, both of legal age, of our own free will
and accord, and in the presence of the person solemnizing this marriage and of the witnesses named below, take
each other as husband and wife, and certifying further that we:

☒ have not entered into a marriage settlement.

☐ have entered into a marriage settlement, a copy of which is hereto attached.

IN WITNESS WHEREOF, we have signed/marked with our finger print, this certificate in quadruplicate this
__18th__ day of __April__, __2008__.

CHEYNE CHRISTOPHER PARHAM          MARY JOY C. PINGCA
(Signature of Husband)                    (Signature of Wife)

THIS IS TO CERTIFY THAT BEFORE ME, on the date and place above-written, personally appeared
the above-mentioned parties, with their mutual consent, lawfully joined together in marriage which was solemnized
by me in the presence of the witnesses named below, all of legal age.

I CERTIFY FURTHER THAT:

☐ Marriage License No. __3050320__ issued on __April 18, 2008__ at
__Midsayap, Cotabato__ in favor of said parties, was exhibited to me.

☐ no marriage license was necessary, the marriage being solemnized under
Art. ____ of Executive Order No. 209.

☐ the marriage was solemnized in accordance with the provisions of Presidential
Decree No. 1083

__Pastor Celso A. Gurrea__
(Signature of Solemnizing Officer)

__Evangelist/Pastor__
(Position/Designation)

Church of Christ, __UESOWHESC__ December 31,2009

RECEIVED AT THE OFFICE
OF THE CIVIL REGISTRAR

Signature

Name in Print

Title or Position

Date Received

EXHIBIT B

(Fill out completely, accurately and legibly. Use ink or typewriter.
Place X before the appropriate answer in Items 2, 5a, 5b and 19b.)

**Municipality** DAVAO CITY

**Registry No.** 2008 - 013725

| 1. NAME | (First) | (Middle) | (Last) |
|---|---|---|---|
| | ERICA JOY | PINGCA | PARHAM |

For OCRG USE ONLY:
Population Reference No.

2. SEX
1. Male  **X**  2. Female

3. DATE OF BIRTH (day) (month) (year)
28 AUGUST 2008

TO BE FILLED UP AT THE OFFICE OF THE CIVIL REGISTRAR

4. PLACE OF BIRTH (Name of Hospital/Clinic/Institution/ House No., Street, Barangay) (City/Municipality) (Province)
DAVAO DOCTORS HOSPITAL E. QUIRINO AVE.,DAVAO CITY

5a. TYPE OF BIRTH
1. Single  **X**  2. Twin
3. Triplet, etc.

b. IF MULTIPLE BIRTH, CHILD WAS
**X**  1. First  2. Second
3. Others, Specify _____

c. BIRTH ORDER (live births and fetal deaths including this delivery) (first, second, third, etc.)
SECOND

d. WEIGHT AT BIRTH
2,000 grams

6. MAIDEN NAME (First) (Middle) (Last)
MARY JOY CARAEL PINGCA

7. CITIZENSHIP FILIPINO

8. RELIGION ROMAN CATHOLIC

9a. Total number of children born alive: 02
b. No. of children living including this birth: 02
c. No. of children born alive but are now dead: 00

10. OCCUPATION HOUSEWIFE

11. Age at the time of this birth: 25

11. RESIDENCE (House No., Street, Barangay) (City/Municipality) (Province)
KM. 23 PROMISE LAND,BUNAWAN,DAVAO CITY

13. NAME (First) (Middle) (Last)
CHEYNE CHRISTOPHER PARHAM

14. CITIZENSHIP AMERICAN

15. RELIGION ROMAN CATHOLIC

16. OCCUPATION ARMY

17. Age at the time of this birth: 27

18. DATE AND PLACE OF MARRIAGE OF PARENTS (If not married, accomplish Affidavit of Acknowledgement/Admission of Paternity at the back.)
18 APRIL 2008- STA.CRUZ CHURCH OF CHRIST, STA.CRUZ,DAVAO DEL SUR

**CERTIFIED TRUE PHOTO COPY**

19. ATTENDANT
**X**  1. Physician  2. Nurse  3. Midwife
(Not traditional Midwife)  4. Others (Specify)

20. CERTIFICATION OF BIRTH
I hereby certify that I attended the birth of the child who was born alive at 6:10 AM o'clock on the date stated above.

GLYNDA P. CAPOY, M.D.
ATTENDING PHYSICIAN

DAVAO DOCTORS HOSPITAL
E. QUIRINO AVE.,DAVAO CITY
Date SEPTEMBER 04, 2008

J.E. R. VILLANUEVA
Administrative Aide IV

21. INFORMANT
MARY JOY P. PARHAM
MOTHER

KM.23 PROMISE LAND
BUNAWAN, DAVAO CITY
Date SEPTEMBER 04, 2008

EXHIBIT c

22. PREPARED BY

23. RECEIVED AT THE OFFICE OF THE CIVIL REGISTRAR

SHIRLEY S. ARENDAIN
Actg. Head, Birth Div., CCPO

OFFICE OF THE CIVIL REGISTRAR GENERAL
CERTIFICATE OF LIVE BIRTH

SEP 10 2008
Date
CITY OF DAVAO

Province **DAVAO CITY**

Registry No. **2008-29386**

For OCRG USE ONLY.
Population Reference No.

NAME (First) **MARY ELYSE** (Middle) **PINGCA** (Last) **PARHAM**

SEX 1. Male **X** 2. Female

3. DATE OF BIRTH (day) (month) (year) **28 AUGUST 2008**

TO BE FILLED UP AT THE OFFICE OF THE CIVIL REGISTRAR

41

PLACE OF BIRTH (Name of Hospital/Clinic/Institution/House No., Street, Barangay) (City/Municipality) (Province)
**DAVAO DOCTORS HOSPITAL E. QUIRINO AVE.,DAVAO CITY**

TYPE OF BIRTH 1. Single **X** 2. Twin 3. Triplet, etc.

b. IF MULTIPLE BIRTH, CHILD WAS 1. First **X** 2. Second 3. Third, Fourth, etc.

BIRTH ORDER (live births and fetal deaths including this delivery) (First, second, third, etc.) **THIRD**

d. WEIGHT AT BIRTH **1,860** grams

MAIDEN NAME (First) **MARY JOY** (Middle) **CARAEL** (Last) **PINGCA**

CITIZENSHIP **FILIPINO**

RELIGION **ROMAN CATHOLIC**

a. Total number of children born alive **03**

b. No. of children still living including this birth **03**

c. No. of children born alive but are now dead: **00**

OCCUPATION **HOUSEWIFE**

Age at the time of this birth **25** years

RESIDENCE (House No., Street, Barangay) (City/Municipality) (Province)
**KM. 23 PROMISE LAND,BUNAWAN, DAVAO CITY**

NAME (First) **CHEYNE** (Middle) **CHRISTOPHER** (Last) **PARHAM**

CITIZENSHIP **AMERICAN**

RELIGION **ROMAN CATHOLIC**

OCCUPATION **ARMY**

Age at the time of this birth **27** years

DATE AND PLACE OF MARRIAGE OF PARENTS (If not married, accomplish Affidavit of Acknowledgement/Admission of Paternity at the back.)
**18 APRIL 2008- STA.CRUZ CHURCH OF CHRIST,STA.CRUZ,DAVAO DEL SUR**

**CERTIFIED TRUE PHOTO COPY**

ATTENDANT **X** 1. Physician 2. Nurse 3. Midwife 4. Hilot (Traditional Midwife) 5. Others (Specify)

CERTIFICATION OF BIRTH
I hereby certify that I attended the birth of the child who was born alive at **6:11 AM** o'clock on the date stated above.

GLYNDA P. CAPOY, M.D.
ATTENDING PHYSICIAN

DAVAO DOCTORS HOSPITAL
E. QUIRINO AVE.,DAVAO CITY
SEPTEMBER 04, 2008

J.E. R. VILLANUEVA
Administrative Aide IV
1- 10/2/08

Mary Joy P. Parham
MARY JOY P. PARHAM
MOTHER

KM.23 PROMISE LAND
BUNAWAN,DAVAO CITY
SEPTEMBER 04, 2008

EXHIBIT D

NO. 09-03-19712



| | | |
|---|---|---|
| **IN THE INTEREST OF** | § | **IN THE COUNTY COURT AT LAW** |
| | § | |
| **MARY ELYSE PARHAM AND ERICA** | § | **OF** |
| **JOY PARHAM** | § | |
| **CHILDREN** | § | **WALLER COUNTY, TEXAS** |

## ORDER IN JOINT SUIT AFFECTING THE PARENT-CHILD RELATIONSHIP

On the date signed below the Court heard this case.

*Appearances*

Petitioner, Cheyne Christopher Parham, did not appear in person but has agreed to the terms of this order as evidenced by Petitioner's signature below.

Respondent, Mary Joy Pingca Parham, has made a general appearance, by joining the original petition and has agreed to the terms of this order to the extent permitted by law, as evidenced by Respondent's signature below.

*Jurisdiction*

The Court, after examining the record and the evidence and argument of counsel, finds that it has jurisdiction of this case and of all the parties and that no other court has continuing, exclusive jurisdiction of this case. All persons entitled to citation were properly cited.

*Jury*

A jury was waived, and all questions of fact and of law were submitted to the Court.

*Record*

The making of a record of testimony was waived by the parties with the consent of the Court.

*Children*

The Court finds that the following children are the subject of this suit:

## EXHIBIT E

Name: Mary Elyse Parham

Sex: female

Birth date: 08/28/2008

Home state: Texas

Social Security number: pending

Driver's license number and issuing state: na

Name: Erica Joy Parham

Sex: female

Birth date: 08/28/2008

Home state: Texas

Social Security number: pending

Driver's license number and issuing state: na

The Court having considered the evidence submitted, finds that Mary Elyse Parham and Erica Joy Parham were born in wedlock. The Court finds that all requirements of filiation have been satisfied. The Court finds by clear and convincing evidence that it would be inequitable to request genetic testing to attempt to disprove the father-child relationship between these children and their father. The Court further finds that the Insurance for the Department of the Army has previously recognized these children as the natural offspring of Cheyne Christopher Parham based on his admission at birth and presentation for coverage.

Therefore, the Court finds that Mary Elyse Parham and Erica Joy Parham are the natural born children of Cheyne Christopher Parham, and that Cheyne Christopher Parham is the natural parent of Mary Elyse Parham and Erica Joy Parham.

The Court further finds that there is still a marital relationship between Cheyne Christopher Parham, the father of these children, and Mary Joy Pingca Parham, the mother of these children, therefore no court orders regarding conservatorship or support is required at this time.

IT IS THEREFORE ORDERED, ADJUDGED and DECREED

That Mary Elyse Parham and Erica Joy Parham are the natural born children of Cheyne Christopher Parham, and that Cheyne Christopher Parham is

EXHIBIT E

the natural father of Mary Elyse Parham and Erica Joy Parham, for all purposes.

*Relief Not Granted*

IT IS ORDERED that all relief requested in this case and not expressly granted is denied.

*Date of Order*

SIGNED on _____

**JUDGE PRESIDING**

APPROVED AND CONSENTED TO AS TO BOTH FORM AND SUBSTANCE:

_____

Cheyne Christopher Parham, Petitioner

_____

Mary Joy Pingca Parham, Respondent

STATE OF TEXAS, COUNTY OF WALLER
I, PAT J. SPADACHENE, Clerk of the District Court in for the County of Waller, Texas do hereby certify that this foregoing instrument is a true and correct copy of the original now on file in the office.

IN WITNESS WHEREOF, I hereunto set my hand and the Seal of said Court this _____ day of _____ 20 ___

**EXHIBIT E** PAT J. SPADACHENE, DISTRICT CLERK

By _____ Deputy

**From:** ACS InfoManila
**Sent:** Tuesday, March 17, 2009 3:30 AM
**To:** (Cornyn)
**Subject:** Congressional Inquiry: Cheyne Christopher Parham

The Honorable
John Cornyn
United States Senator

Dear Senator Cornyn:

I am writing in response to your inquiry regarding the applications for a Consular Report of Birth Abroad (CRBA) and U.S. passport of Mary Elyse Pingca Parham and Erica Joy Pingca Parham, the claimed twins of your constituent, Cheyne Christopher Parham.

Mary Elyse and Erica Joy's applications are being reviewed under Section 301(g) of the Immigration and Nationality Act. This section of law provides that in order for a child to qualify for derivative citizenship through his/her U.S. citizen father, the child's biological and legal relationship to the father must be established. The law also requires that the U.S. citizen father must have been physically present in the U.S. for five years, two of which must be after the age of 14 and before the birth of the child, to transmit citizenship. The remaining issue on this case is the biological relationship between Mr. Parham and the twins.

Based on the documents presented and the circumstances of Mary Elyse and Erica Joy's conception and birth, the consular officer handling the case was not convinced that there was "clear and convincing" evidence that Mr. Parham is the only possible biological father of Mary Elyse and Erica Joy. Mary Elyse and Erica Joy's mother told the consular officer during the interview that she met Mr. Parham on September 22, 2007 at a club in Korea. She claimed that she was working as an entertainer at the club. She said that she and Mr. Parham's intimate relationship started on September 25, 2007, three days after they first met. She and Mr. Parham were not married yet at the time Mary Elyse and Erica Joy were conceived in Korea. They got married in the Philippines only when she was about 3 or 4 months pregnant already. As proof of her relationship to Mr. Parham, she presented a few undated pictures taken of them together, but they were found insufficient. In view of the foregoing circumstances, the consular officer suggested that Mr. Parham and one of the twins undergo DNA testing to establish their biological relationship. The mother was provided with an information sheet about DNA testing.

I hope the above information is helpful to you in replying to your constituent. If I can be of further assistance in this or any other matter, please do not hesitate to contact me.

Sincerely,

Bradley Wilde
Consul
American Citizens Services

EXHIBIT F

## RJP Business

| | |
|---|---|
| **From:** | "Parham, Cheyne C CPT MIL USA TRADOC" |
| **To:** | &lt;rjparham@sbcglobal.net&gt; |
| **Sent:** | Tuesday, March 31, 2009 15:49 |
| **Subject:** | FW: Congressman McCaul assistance (UNCLASSIFIED) |

The Honorable

Michael T. McCaul

United States Congressman

Attention: Kris Parker

E-mail: Kris.Parker@mail.house.gov

Dear Congressman McCaul:

I am writing in response to your letter dated March 16, 2009, which was received by our office on March 25, 2009, regarding the applications for a Consular Report of Birth Abroad (CRBA) and U.S. passport of Mary Elyse Pingca Parham and Erica Joy Pingca Parham, the claimed twins of your constituent, Cheyne Christopher Parham.

Mary Elyse and Erica Joy's applications are being reviewed under Section 301(g) of the Immigration and Nationality Act. This section of law provides that in order for a child to qualify for derivative citizenship through his/her U.S. citizen father, the child's biological and legal relationship to the father must be established. The law also requires that the U.S. citizen father must have been physically present in the U.S. for five years, two of which must be after the age of 14 and before the birth of the child, to transmit citizenship. The remaining issue on this case is the biological relationship between Mr. Parham and the twins.

Based on the documents presented and the circumstances of Mary Elyse and Erica Joy's conception and birth, the consular officer handling the case was not convinced that the preponderance of the evidence supported Mr. Parham's being the only possible biological father of Mary Elyse and Erica Joy. Mary Elyse and Erica Joy's mother told the consular officer during the interview that she met Mr. Parham on September 22, 2007 at a club in Korea. She claimed that she was working as an entertainer at the club. She said that she and Mr. Parham's intimate relationship started on September 25, 2007, three days after they first met. She and Mr. Parham were not married yet at the time Mary Elyse and Erica Joy were conceived in Korea. They got married in the Philippines only when she was about 3 or 4 months pregnant already. As proof of her relationship to Mr. Parham, she presented a few undated pictures taken of them together, but they were found insufficient. In view of the foregoing circumstances, the consular officer suggested that Mr. Parham and one of the twins undergo DNA testing to establish their biological relationship. The mother was provided with an information sheet about DNA testing.

I hope the above information is helpful to you in replying to your constituent. If I can be of further assistance in this or any other matter, please do not hesitate to contact me.

Sincerely,

Consul

American Citizens Services

# EXHIBIT G